**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PATRICK F. BURNS, SR.,<br><br>                      Plaintiff,<br><br><br>      v.<br><br><br>THE CITY OF WORCESTER, City Manager EDWARD M. AUGUSTUS, JR., Acting City Manager ERIC D. BATISTA, Acting Fire Chief MARTIN DYER, and Deputy Fire Chief JOHN POWERS,<br><br>                     Defendants. | Civil Action No. 4:23-cv-40001-MRG |

<u>**MEMORANDUM AND ORDER**</u>

**GUZMAN, J.**

Plaintiff Patrick F. Burns, Sr. ("Plaintiff" or "Burns"), a former firefighter with the City of Worcester Fire Department, brings this action against the City of Worcester (the "City"), Edward M. Augustus, Jr. ("Augustus"), Eric D. Batista ("Batista"), Martin Dyer ("Dyer"), and John Powers ("Powers") (collectively, "Defendants"), alleging that they terminated his employment without due process and in violation of his constitutional and statutory rights. Defendants have moved to dismiss all counts pursuant to Federal Rule of Civil Procedure 12(b)(6). [ECF No. 19]. For the reasons set forth below, Defendants' motion to dismiss is <u>**GRANTED**</u>.

I.     **Background and Procedural History**[1]

Burns was employed as a firefighter with the City of Worcester Fire Department from 2010 until his termination in 2023. [ECF No. 1 ("Compl.") ¶¶ 16, 20]. After completing training and a year of probationary service, Burns became a permanent full-time member of the Fire Department with tenure under the Massachusetts Civil Service Law in 2010. [Id. ¶ 16.]. In 2015, Burns joined Rescue 1, a specialized unit within the Fire Department that "specializes in recovery of people or bodies from fire scenes or other incident locations where people may have been injured or killed." [Id. ¶¶ 19-20.].

On September 21, 2021, Burns was working as part of a Rescue 1 crew that was dispatched to Green Hill Park to participate in training exercises with other Fire Department units. [Id. ¶ 25.]. During a break in the training, with his supervisor's permission, Burns used his cell phone to remotely attend a hearing before the Worcester Probate and Family Court concerning litigation with his former wife over custody of their two children. [Id. ¶¶ 27-28.]. While Burns was participating in the hearing from inside the Rescue 1 truck, Deputy Fire Chief John Powers ("Powers") opened the door at the rear of the truck. [Id. ¶¶ 28-29.]. Burns, who was sitting about 25 feet away near the front of the vehicle, told Powers he was participating in a court hearing and would be free shortly. [Id. ¶ 30.]. Powers closed the door without entering the truck. [Id. ¶ 31.].

Later that afternoon, after the Rescue 1 unit had completed the training exercises and returned to its base at the Franklin Street fire station, Powers ordered the unit to report to the Fire

---

[1] The Court notes that while a motion to dismiss generally requires consideration of only the complaint and documents explicitly incorporated therein, courts may also consider "documents the authenticity of which are not disputed by the parties," "official public records," or "documents sufficiently referred to in the complaint." Abiomed, Inc. v. Enmodes GmbH, No. 23-cv-10087-DJC, 2024 WL 3927968, at *19 (D. Mass. Aug. 23, 2024) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)); accord Schaefer v. Indymac Mortg. Servs., 731 F.3d 98, 100 n.1 (1st Cir. 2013). The exhibits attached to Defendants' motion meet this criterion and Plaintiff has not objected to their consideration. These documents include correspondence between the parties and official records from the Civil Service Commission proceedings, all of which are central to Plaintiff's claims and provide context for the allegations in the Complaint.

Department's Grove Street headquarters. [Id. ¶¶ 33-34.]. Upon arrival, Burns's supervisor, Lt. Jackson Lowbridge, told Burns that Powers wanted to speak with him. [Id. ¶ 35.]. Burns and Lowbridge entered the headquarters building and went to a conference room where Powers and another department supervisor were waiting. [Id. ¶ 36.]. During this meeting, Powers repeatedly told Burns "you're on drugs," and that "your pupils are pin-point." [Id. ¶ 37.]. Powers ordered Burns to submit to drug testing of his urine and accused Burns of insubordination when he did not agree. [Id.]. According to Burns, Powers had no opportunity to accurately observe the configuration of his pupils that day. [Id. ¶ 38.]. During their brief encounter that morning at Green Hill Park, Powers was never closer than 25 feet from Burns. [Id. ¶ 39.].

Burns alleges that at the time of the meeting, there was nothing abnormal or remarkable about his presentation, including his pupils. [Id. ¶ 40.]. He further claims that at no time before or during his tenure at the Fire Department did he abuse alcohol or prescription drugs or use illicit drugs, nor had he ever consumed drugs or alcohol while on duty or ever been under the influence of drugs or alcohol on duty. [Id. ¶ 41.]. Burns maintains that his fitness for duty records contained no sign of possible drug or alcohol issues. [Id. ¶ 42.]. Burns had recently begun the lawful off-duty use of prescribed oral cannabidiol (CBD), a non-intoxicating derivative of cannabis, as a sleep aid; he was unsure how this could affect drug test results or how such results might be interpreted or portrayed. [Id. ¶ 46.]. Burns was particularly concerned about the potential consequences of the test on his ongoing child custody dispute. [Id. ¶¶ 48-49.]. According to Burns, Powers knew about this custody dispute, as Burns had visited Powers at his office about two weeks previously and informed him of difficulties related to the matter. [Id. ¶¶ 50-51.].

During the meeting, Burns neither explicitly agreed to take the test nor explicitly rejected Powers's order to take it. [Id. ¶ 52.]. As Powers repeatedly pressed him to decide, Burns became

distraught, with tears streaming down his face. [Id. ¶ 53.]. He raised his voice and accused Powers of lying about the condition of his pupils and about that being the basis of Powers's drug abuse claim. [Id. ¶ 54.]. Burns repeatedly asked for "mental health help." [Id. ¶ 55.]. Finally, as Powers pressed him to say what his decision was on testing, Burns exclaimed: "What I'm saying is that I need mental health help right now. Are you denying me mental health help?" [Id. ¶ 56.]. Powers did not answer Burns but stood up and left the room. [Id. ¶ 57.].

Following this meeting, Burns was taken off duty less than halfway through his shift, driven back to the station in another vehicle, and sent home. [Id. ¶ 58.]. Initially, Burns was suspended with pay. [Id. ¶ 60.]. His payroll record for September 21, 2021, shows him being paid for 10 hours on duty and 14 hours sick time, and for his next two scheduled shifts on September 26 and 29, 2021, he received full pay under notations of "Admn W Pay." [Id. ¶¶ 61-62.]. On October 15, 2021, however, the City terminated Burns's compensation retroactive to October 8 by rescinding the "Admn W Pay" entries. [Id. ¶ 63.]. These entries were replaced with entries charging his pay to accumulated sick time and vacation time. [Id. ¶ 64.]. Burns alleges that this change in status from paid to unpaid suspension occurred without prior notice or opportunity for him to be heard. [Id. ¶ 65.].

In November 2021, Burns met twice with Powers, providing him with results of a urine screen from November 8, 2021, as well as letters from primary health and mental health providers attesting to his fitness for duty. [Id. ¶ 67.]. That month, Burns was notified in a telephone call from a union officer that to keep his job he would have to enter into an agreement with the City essentially admitting that he had a drug abuse problem and requiring him to complete substance abuse rehabilitation treatment. [Id. ¶ 68.]. On January 21, 2022, the City sent Burns a letter signed by Kimberly A. McMahon, Coordinator of Labor Relations, repeating this demand. [Id. ¶¶ 71-

72.]. According to the letter, at the meeting with Powers on September 21, 2021, Burns did not submit to drug testing and instead "opted to enter into an agreement with the City that requires you to complete substance abuse rehabilitation treatment." [Id. ¶ 72.].

A proposed agreement enclosed with the January 21 letter required Burns to accept its premise that he was an admitted drug abuser. [Id. ¶ 73.]. The agreement called for Burns to complete treatment with a licensed substance abuse rehabilitation program and provide negative results from hair, urine, and breathalyzer tests, or to accept a "last chance agreement" requiring three years of highly intrusive drug testing on demand with "physical inspection" before providing a urine sample and provision of each sample "under direct observation." [Id. ¶ 74.]. The agreement also included "permanent transfer off the Rescue [unit] and outside the Franklin Street Fire Station" with Burns to be barred from assignment to that station "even on a temporary basis." [Id. ¶ 75.]. The letter stated the City would "move for your termination" if Burns did not return the signed agreement within 10 days. [Id. ¶ 76.].

Burns, through his lawyer, answered McMahon's letter on January 31, 2022, offering to submit to any drug or health screening the City might require before returning to duty and to abide by the same regulations applicable to all firefighters regarding drugs and alcohol. [Id. ¶ 80.]. There was no response to this proposal. [Id.].

On August 12, 2022, then-acting city manager Eric D. Batista sent Burns a notice of termination, reiterating the claim that Burns had agreed to treatment for substance abuse and stating that because he had not signed the City's proposed agreement "the City has concluded that you no longer desire to remain employed as a firefighter with the City." [Id. ¶ 81.]. A copy of the termination letter was made part of the City's permanent personnel file on Burns. [Id. ¶ 82.]. In terminating Burns, Batista relied on Mass. Gen. Laws ch. 31, § 38, which applies to termination

for unauthorized absence and bars recourse by the dismissed employee to civil service protections provided under c. 31 §§ 41-45. [Id. ¶ 83.]. Batista's termination letter claimed that by failing to sign an agreement with the City dealing with his supposed drug abuse, Burns had abandoned his position without permission. [Id. ¶ 84.]. Burns accepted an offer in the termination letter for an administrative hearing on his alleged unauthorized absence. [Id. ¶ 85.]. The hearing was initially scheduled for October 11, 2022, but the City postponed it on October 10th. [Id. ¶ 86.].

Burns filed this federal complaint on January 3, 2023. On February 28, 2023, the City sent Burns a letter rescinding the initial August 12, 2022 termination notice and providing notice of a new termination hearing, pursuant to Mass. Gen. Laws ch. 31, §§ 38 and 41. The termination hearing was held on June 7, 2023, where Burns, represented by counsel, testified, presented evidence, and cross-examined the City's witnesses. [ECF No. 19-1 at 9]. After the hearing, the hearing officer found there was good cause for the Department's findings of insubordination and job abandonment, and just cause for termination from employment. [Id. at 13]. On September 12, 2023, the City sent a letter to Burns, indicating that it was adopting the findings and conclusions of the Hearing Officer's decision and terminating his employment, effective immediately. [Id. at 8].

On September 22, 2023, Burns filed an appeal with the Civil Service Commission, pursuant to Mass. Gen. Laws ch. 31, §§ 41-45, contesting his termination. [Id. at 44]. A pre-hearing conference was held before Commissioner Christopher Bowman. [Id. at 36, 44]. On November 1, 2023, Commissioner Bowman issued a procedural order asking Burns's counsel to clarify whether the appeal involved only a Section 43 (just cause) appeal or also a Section 42 (procedural) appeal. [Id. at 36-39]. On November 28, 2023, Burns's attorney informed the Commission that the appeal "does not include a Section 42 (procedural) appeal." [Id. at 41]. The Civil Service Commission

6

held a full evidentiary hearing on Burns's just cause appeal on January 24, 2024, and on June 27, 2024, denied the appeal, holding that the Worcester Fire Department had just cause to terminate Burns for insubordination related to his unwillingness to adhere to a rehabilitation agreement to return to work. [Id. at 43-64].

## II.    Legal Standard

A complaint "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)). But under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss an action arguing that it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555 (citations omitted). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (quoting Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).

On a motion to dismiss made pursuant to Rule 12(b)(6), the factual allegations in the complaint are accepted as true, and the Court draws "all reasonable inferences in favor of the plaintiff." Trans-Spec Truck Serv. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008) (citing Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992)).

### III.    Discussion

Plaintiff brings both federal and state claims in this action. Accordingly, the Court will address the federal and state claims separately.[2] Counts I-IV, VI, and VII allege violations of constitutional rights under 42 U.S.C. § 1983 ("Section 1983"). The remaining claims allege violations of state law. Count V alleges a violation of the Massachusetts Declaration of Rights, Count VII alleges a common law conspiracy, Count VIII alleges a violation of the Massachusetts Civil Rights Act, and Count X alleges intentional infliction of emotional distress. The Court first turns to the federal claims.

### A.  Federal Claims

#### 1.  Section 1983 Claims

Section 1983 "is a vehicle through which individuals may sue certain persons for depriving them of federally assured rights[.]" Gagliardi, 513 F.3d at 306. In order to succeed on a Section 1983 claim, a plaintiff must show that defendants acted under the color of state law, and that his or her conduct deprived plaintiff of rights secured by the Constitution or by federal law. Id. (citing Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997)). Vicarious liability is inapplicable to Section 1983 claims. See Welch v. City of Biddeford Police Dep't, 12 F.4th 70, 75-76 (1st Cir. 2021) ("Officers are not liable under § 1983 for the actions of other officers"). As such, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

---

[2] To the extent a state claim overlaps with a federal claim, the Court will analyze both under the federal claims section.

### a) Count I: Deprivation of Livelihood Without Due Process (42 U.S.C. § 1983)

At Count I, Plaintiff claims that the City, Powers, Dyer, and Augustus deprived him of his livelihood without due process. The Due Process Clause of the Fourteenth Amendment "has both procedural and substantive components." DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005). While procedural due process "ensures that government, when dealing with private persons, will use fair procedures," id. (citing Fuentes v. Shevin, 407 U.S. 67, 80-82 (1972)), substantive due process "safeguards individuals against certain offensive government actions, notwithstanding that facially fair procedures are used to implement them," id. (citing Daniels v. Williams, 474 U.S. 327, 331 (1986)). The Complaint alleges that the City, Powers, Dyer, and Augustus deprived Plaintiff of his livelihood from employment as a firefighter without due process of law. [Compl. ¶¶ 87-92]. We will thus analyze both due process components.

However, before we turn to the substance of that analysis, the Court takes note of Defendants' argument that Plaintiff's claim is time-barred. [ECF No. 19 at 13]. That contention is without merit. To determine the statute of limitations for a Section 1983 claim, courts look to "the law of the [s]tate in which the cause of action arose," Wallace v. Kato, 549 U.S. 384, 387 (2007), specifically "that state's designated limitations period for general personal injury torts," Ouellette v. Beaupre, 977 F.3d 127, 135 (1st Cir. 2020) (citing Owens v. Okure, 488 U.S. 235, 236 (1989)). Massachusetts provides a three-year statute of limitations for personal injury claims that commences when a plaintiff learns of or has reason to know of the alleged injury. Mass. Gen. Laws ch. 260, § 2A; see Verrier v. Beth Israel Deaconess Hosp.-Plymouth, Inc., 706 F. Supp. 3d 142, 147 (D. Mass. 2023). Here, the events underlying Plaintiff's claim occurred on or before September 21, 2021 and thereafter. Because the Complaint was filed on January 3, 2023, Plaintiff's claim is within the statute of limitations.

### (1) Procedural Due Process

In order to establish a valid procedural due process claim, a plaintiff must show that he or she "was deprived of a property interest by defendants acting under color of state law and without the availability of a constitutionally adequate process." Maymi v. P.R. Ports Auth., 515 F.3d 20, 29 (1st Cir. 2008). The Fourteenth Amendment "affords due process protections to public employees who possess property interests in continued public employment." Galloza v. Foy, 389 F.3d 26, 33 (1st Cir. 2004) (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)). It is undisputed that Plaintiff possess a property interest in his employment as a full-time member of the Fire Department with tenure under Mass. Gen. Laws. ch. 31, §§ 41-45. Thus, the issue is whether the City, Powers, Dyer, and Augustus deprived Plaintiff of that interest without adequate process.

"Pre-termination and post-termination proceedings are not evaluated for constitutional adequacy in isolation from each other." Senra v. Town of Smithfield, 715 F.3d 34, 39 (1st Cir. 2013). A post-depravation remedy may cure a pre-deprivation procedural inadequacy caused by the random or unauthorized conduct of defendants. Hadfield v. McDonough, 407 F.3d 11, 21 (1st Cir. 2005).

### (a) Pre-Termination Procedures

Plaintiff asserts that he was taken off duty without due process of law. "Because Plaintiff had a protected property interest in his continued employment, he could not be discharged without due process, including a hearing before his termination." Murphy v. Mass. Exec. Office of Tr. Ct., 335 F. Supp. 3d 137, 147 (D. Mass. 2018) (citing Loudermill, 470 U.S. at 538-42). A pretermination hearing "need not be elaborate." Loudermill, 470 U.S. at 545. Indeed, "something less" than a full evidentiary hearing would be considered sufficient due process. Id.; see O'Neill

v. Baker, 210 F.3d 41, 48 (1st Cir. 2000) ("[A] very limited hearing prior to termination [is] sufficient, provided that it [is] followed by a more comprehensive post-termination hearing."). At a minimum, a tenured employee is entitled to receive oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. Chmielinski v. Massachusetts, 513 F.3d 309, 316 (1st Cir. 2008).

Defendants contend that on August 12, 2022, they put Plaintiff on notice that they intended to terminate him for his refusal to enter a rehabilitation program. The letter explained the grounds on which the City relied to move forward with its decision to terminate Plaintiff, and also provided that Plaintiff was entitled to an administrative hearing to contest his termination. Plaintiff subsequently requested a hearing. While it was initially scheduled for October 11, 2022, the hearing ultimately took place on June 7, 2023, where Burns, represented by counsel, had the opportunity to testify, present evidence, and cross-examine witnesses. In Defendants' view, these procedures pass muster because they provided Plaintiff with notice and an opportunity to respond.

But the analysis does not end there. Plaintiff was initially placed on administrative leave with pay. In cases where an employee is suspended with pay, due process generally does not require a pre-suspension hearing. See Dobelle v. Flynn, 12 F. Supp. 3d 274, 298 n.11 (D. Mass. 2014) ("[A] suspension with pay normally will not constitute a property deprivation." (citing Cronin v. Town of Amesbury, 895 F. Supp. 375, 386 (D. Mass. 1995))). However, because Plaintiff's status later changed to administrative leave without pay, due process may call for procedural protections as the particular situation demands. See Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 9-10 (1st Cir. 2003) (explaining that Supreme Court "rejected a categorical rule imposing constitutional due process requirements on suspensions without pay"). While the Supreme Court has recognized the severity of depriving someone of the means of their livelihood,

11

it has also emphasized that in determining what process is due, account must be taken to "the length" and "finality of the deprivation." Gilbert v. Homar, 520 U.S. 924, 932 (1997) (emphasis in original) (citing Fed. Deposit Ins. Co. v. Mallen, 486 U.S. 230, 243 (1988); Loudermill, 470 U.S. at 543) (quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 434 (1982)). In the context of suspension without pay, an employee is not entitled to notice and hearing prior to his suspension without pay if the "employee receives a sufficiently prompt post-suspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are . . . not affected at all." O'Connor v. Spain, No. 12-cv-40106-TSH, 2012 WL 3822101, at *10 (D. Mass. Aug. 31, 2012) (citing Gilbert, 520 U.S. at 932).

Taking the facts alleged in the Complaint as true, Plaintiff was placed on unpaid suspension on or about October 15, 2021, when Defendants retroactively converted his paid suspension to unpaid and charged his compensation against accumulated sick time and vacation benefits. [Compl. ¶¶ 60-64]. This changed occurred "without notice of that action or of the information on which it was based and without opportunity for Burns to be heard or make a presentation of his side of the matter." [Id. ¶ 65]. Plaintiff alleges he remained without pay from October 2021 until his termination in August 2022, nearly a year later. [Id. ¶¶ 65-66, 81]. While Plaintiff received some process through his eventual termination hearing on June 7, 2023, this process came approximately 20 months after Plaintiff was initially deprived of his pay. Such a significant delay between the deprivation and the hearing cannot be said to arguably satisfy the requirement that due process be provided in a "sufficiently prompt" manner. O'Connor, 2012 WL 3822101, at *10 (citing Gilbert, 520 U.S. at 932). The Court cannot also reach the conclusion that the deprivation of income in that period was "relatively insubstantial." Id. However, whether these deficiencies

constituted a violation of Plaintiff's due process rights will depend on the adequacy of the post-deprivation process he received. See Senra, 715 F.3d at 39; Hadfield, 407 F.3d at 21.

Defendants also contend that they did not violate Plaintiff's due process rights because Plaintiff waived his right to appeal his suspension to the Civil Service Commission pursuant to Mass. Gen. Laws ch. 31, § 42. Pursuant to that provision, "[a]ny person who alleges that an appointing authority has failed to follow the requirements of [Mass. Gen. Laws ch. 31, § 41]" including the provision of written notice and an opportunity to be heard, "in taking action which has affected his employment or compensation may file a complaint with the [Civil Service Commission]," within ten days after such action was taken. Mass. Gen. Laws ch. 31, §§ 41, 42. Defendants, however, oversee that this provision only intends to provide a remedy, and "exhaustion is not a precondition to bringing a section 1983 claim in federal court." Martinez-Rivera v. Puerto Rico, 812 F.3d 69, 74 (1st Cir. 2016) (citing Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496, 501-02 (1982); Alamo-Hornedo v. Puig, 745 F.3d 578, 581 (1st Cir. 2014)). Indeed, Section 41 provides that before a tenure employee is suspended for a period of more than five days, he "shall be given a written notice . . . , the specific reason or reasons for such action and a copy of sections forty-one through forty-five, and shall be given a full hearing concerning such reason or reasons before the appointing authority or a hearing officer designated by the appointing authority." Id. § 41. As explained above, while Plaintiff did eventually receive notice and an opportunity to be heard, Plaintiff has made adequate factual allegations regarding the inadequacy of his pre-termination proceedings. Because pre-termination and post-termination proceedings are not examined in isolation, Senra, 715 F.at 39, we will now turn to analyzing whether post-termination procedures cured any inadequacies at the pre-termination stage. Hadfield, 407 F.3d at 21.

(b) Post-Termination Procedures

Plaintiff claims that the City, Powers, Dyer, and Augustus deprived him of his livelihood from employment without due process of law. Plaintiff, who under state law could only be terminated for "just cause," Mass. Gen. Laws. ch. 31, § 41, possessed a protected property interest in his continued employment that could not be taken away without due process. See Loudermill, 470 U.S. at 546. In raising his due process claim, Plaintiff does not argue that the established state procedures are deficient. Rather, Plaintiff's claim rests on alleged random and unauthorized acts by Defendants. Specifically, Plaintiff generally alleges that Powers, Dyer, and Augustus were out to get him, abusing their "power and authority under state law" to cause Plaintiff to be suspended and eventually terminated. [Compl. ¶¶ 87-90]. In instances of "random and unauthorized conduct" by state officials, "additional pre-deprivation safeguards would have little value in preventing an erroneous deprivation of the protected [property] interest." Mard v. Town of Amherst, 350 F.3d 184, 193 (1st Cir. 2003). As such, "[w]hen a deprivation of a property interest is occasioned by random and unauthorized conduct by state officials, . . . the [Supreme] Court has repeatedly emphasized that the due process inquiry is limited to the issue of the adequacy of postdeprivation remedies provided by the state." O'Neill v. Baker, 210 F.3d 41, 50 (1st Cir. 2000) (quoting Lowe v. Scott, 959 F.2d 323, 340 (1st Cir. 1992)). "If a state provides adequate post-deprivation remedies—either by statute or through common-law tort remedies available in its courts—no claim of a violation of procedural due process can be brought under § 1983 against the state officials whose random and unauthorized conduct caused the deprivation." Murphy, 335 F. Supp. 3d at 148 (quoting Lowe, 959 F.2d at 340).

In the instant case, state law requires that before a tenured employee is suspended for a period of more than five days, he "shall be given a written notice . . . , the specific reason or reasons

for such action and a copy of sections forty-one through forty-five, and shall be given a full hearing concerning such reason or reasons before the appointing authority or a hearing officer designated by the appointing authority." Mass. Gen. Laws ch. 31, § 41. By failing to comply with the notice and hearing requirements prior to suspending Plaintiff for longer than 5 days, Powers, Dyer, and Augustus deviated from state law, thereby committing random and unauthorized actions. Cf. Chmielinski, 513 F.3d at 315 (finding that conduct of a termination hearing was not random and unauthorized because it was done in accordance with the state-law statutory and regulatory scheme). Because Massachusetts provides an adequate post-deprivation remedy in the form of the Civil Service Law, see Mass. Gen. Laws. ch. 31, §§ 41-44; O'Neill, 210 F.3d at 48 ("The state procedures prescribed by chapter 31, sections 41-44 of the Massachusetts General Laws clearly fulfill the due process requirements for pre-termination notice and opportunity to be heard."); Cronin, 81 F.3d at 260 (describing post-termination remedies provided by the Massachusetts Civil Service Law), Plaintiff's procedural due process claim is barred as a matter of law, see Murphy, 335 F. Supp. 3d at 148; O'Neill, 210 F.3d at 50.

### (2) Substantive Due Process

Substantive due process "claims are limited to government action that, by its very nature, shock[s] the conscience . . . and [are] reserve[d] . . . for truly horrendous situations." Freeman v. Town of Hudson, 714 F.3d 29, 40 (1st Cir. 2013) (internal citation omitted). The applicable test "is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011) (alteration in original) (quoting González-Fuentes v. Molina, 607 F.3d 864, 881 (1st Cir. 2010). In general, government

15

action is "conscience shocking" when the behavior is "extreme and egregious" or "truly outrageous, uncivilized, and intolerable." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006) (quoting Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999)). "Mere violations of state law, even violations resulting from bad faith, do not necessarily amount to unconstitutional deprivations of substantive due process." DePoutot, 424 F.3d at 119 (citation omitted). This standard was deliberately set high to protect the Constitution from being demoted to "a font of tort law." Cummings v. McIntire, 271 F.3d 341, 344 (1st Cir. 2001) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8, 848 (1998)).

Plaintiff contends that his substantive due process rights were violated when Powers falsely and knowingly accused him of on-duty intoxication, leading to his suspension and subsequent termination. [ECF No. 23 at 8]. As to the individual Defendants, Plaintiff has adequately alleged that Powers was personally involved in the decision to suspend him without due process. Specifically, the Complaint alleges that Powers was the one who initially accused Plaintiff of being under the influence of drugs, leading to Plaintiff's removal from duty. Nonetheless, the Court is unconvinced the behavior in question was truly outrageous and intolerable to constitute conscience-shocking behavior. See Harron, 660 F.3d at 536; Rochin v. California, 342 U.S. 165, 172 (1952) (obtaining evidence by pumping a defendant's stomach against his will); Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004) (intentional framing of innocent persons for serious crimes they did not commit); Harrington v. Almy, 977 F.2d 37, 43-44 (1st Cir. 1992) (requiring police officer charged with child abuse to take a highly intrusive physical test of sexual arousal as a condition of reinstatement). While we need not determine the veracity of the allegations at this stage, assuming arguendo Powers, or any of the Defendants for that matter, engaged in unlawful behavior by fabricating the accusation, that would still fall short of a substantive due process

allegation. DePoutot, 424 F.3d at 119; Melendez-Garcia v. Sanchez, 629 F.3d 25, 36 (1st Cir. 2010) ("The burden to show state action that 'shocks the conscience' is extremely high, requiring 'stunning' evidence of 'arbitrariness and caprice' that extends beyond '[m]ere violations of state law, even violations resulting from bad faith' to 'something more egregious and more extreme.'").

The Complaint's allegations regarding Dyer and Augustus' personal involvement in the due process violation are insufficient to state a claim against them. With respect to Dyer, the Complaint alleges only that he was the acting chief of the Worcester Fire Department at all pertinent times, that "he knew of and had a duty to observe" firefighters' rights, and that he was "contemporaneously aware of Powers' conduct at the meeting." [Compl. ¶¶ 6, 14, 98; ECF No. 23 at 8]. None of these conclusory allegations suffice to establish a claim. In the Court's opinion, these allegations do not do anything more than assert a legal conclusion about Dyer's involvement. See Iqbal, 556 U.S. at 676 (holding that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). Without more, the Complaint does not allege that Dyer participated in the decision to change Plaintiff's status from paid to unpaid suspension or that he had anything to do with his termination, which are the events relevant to the due process violation alleged in Count I.[3]

As for Augustus, the allegations are even more attenuated. The Complaint alleges that he was the city manager at all pertinent times before June 1, 2022, that he had the "authority to hire, discipline, and fire Fire Department employees," and that he had "responsibility to provide oversight and supervision of the Fire Department command staff." [Compl. ¶¶ 11-12]. Again, these allegations describe Augustus' position and general responsibilities but do not establish his

---

[3] While the Complaint states that Dyer "did approve or himself ordered the suspension of Burns without pay," [Compl. ¶ 119] this allegation appears in Count VI regarding supervisory liability, not in the factual allegations section of the Complaint, let alone in Count I. Even considering that allegation, it is stated in conclusory terms without supporting factual allegations.

personal involvement in the specific due process violation at issue. There are no allegations that Augustus knew about Plaintiff's situation, participated in the decision to change his status from paid to unpaid suspension, or had any direct involvement in the events leading to the alleged constitutional violation. The mere recitation of Augustus' job title and general responsibilities is insufficient. See Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 16 (1st Cir. 2011) ("[Section] 1983 liability cannot rest solely on a defendant's position of authority[.]" (citing Ayala-Rodriguez v. Rullan, 511 F.3d 232, 236 (1st Cir. 2007)).

With regard to the City, it is well established that a municipality is not liable for the actions of its employees simply by virtue of the employment relationship. Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978). Instead, a plaintiff seeking to prove municipal liability under Section 1983 must identify a municipal policy or custom that caused the plaintiff's injury. Id. at 694; Oklahoma City v. Tuttle, 471 U.S. 808, 818 (1985); Young v. City of Providence, 404 F.3d 4, 25 (1st Cir. 2005). As an initial matter, Plaintiff has not sufficiently alleged that a municipal custom, policy, or practiced caused the alleged constitutional harm. Indeed, the Plaintiff takes no issue with the due process afforded to him pursuant to the Massachusetts Civil Service Law. Instead, the Complaint provides that the alleged unconstitutional actions were taken by the individual Defendants, who had final policy-making authority. [See Compl. ¶¶ 11-14]. To survive a motion to dismiss, a complaint must provide support for a reasonable inference that an official has the requisite authority. Mere conclusory allegations of the individual Defendants' roles and obligations are insufficient. See Rinksy v. Trs. of Bos. Univ., No. 10cv10779-NG, 2010 WL 5437289, at *5-6 (D. Mass. Dec. 27, 2010) (granting motion to dismiss Section 1983 claim against defendant because the complaint did not provide local or state law, town charter, or procedural manual to support inference that individual had final policy-making authority). The Complaint

18

does not specifically allege or provide any information to support the inference that any of the individual Defendants had final policy-making authority.

Accordingly, Count I must be dismissed as to all Defendants.

### b) Count II: Deprivation of Livelihood by Defamation (42 U.S.C. § 1983)[4]

At Count II, Plaintiff alleges that the City, Powers, Dyer, and Batista violated his liberty interest and well establish right to freedom from defamation, thereby depriving him of the ability to earn a livelihood. [Compl. ¶¶ 93-98]. A claim of defamation does not transgress the Constitution and cannot state an actionable claim under Section 1983. Pasdon v. City of Peabody, 417 F.3d 225, 228-29 (1st Cir. 2005); Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 102 (1st Cir. 2002) ("It is beyond cavil that "defamation, even from the lips of a government actor, does not in and of itself transgress constitutionally assured rights."). Nevertheless, a limited exception exists "where a public-sector employer creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge." Yourga v. City of Northampton, 474 F. Supp. 3d 408, 422-23 (D. Mass. 2020) (quoting Wojcik, 300 F.3d at 103). In such instances, "the Constitution's due process protection require the employer to provide the employee with an opportunity to dispute the defamatory allegations." Wojcik, 300 F.3d at 103. The "failure to provide an adequate name-clearing forum is actionable under § 1983." Id.

---

[4] Defendants contend that Counts II (defamation), IX (invasion of privacy), and X (intentional infliction of emotional distress) should be dismissed on grounds that Plaintiff did not comply with the Massachusetts Tort Claims Act's ("MTCA") presentment requirement. [ECF No. 19 at 25-26]. The MTCA abrogates the Commonwealth's sovereign immunity and, subject to a presentment requirement, permits the assertion of causes of action "against public employers for the negligent or wrongful acts or omissions of their employees acting within the scope of their employment." Nelson v. Salem State Coll., 845 N.E.2d 338, 348 (Mass. 2006) (citing Mass. Gen. Laws ch. 258, § 2). "Intentional torts are expressly exempted from the [MTCA], and therefore a public employer cannot be sued for its employee's intentionally tortious conduct." Id. (citing Mass. Gen. Laws ch. 258, § 10(c)). Because defamation, invasion of privacy, and intentional infliction of emotional distress are intentional torts, they are not subject to the MTCA's presentment requirement set forth under Mass. Gen. Laws ch. 258, § 4. See Mass. Gen. Laws ch. 258, § 10(c) ("The provisions of sections one to eight, inclusive shall not apply to . . . any claim arising out of an intentional tort."). Defendants' claim is therefore without merit.

Plaintiff must satisfy five elements in order to raise an actionable claim premised on the failure to provide a name-clearing hearing: "(1) the alleged defamatory statement must seriously damage the employee's standing and association in the community; (2) the employee must dispute the statement as false; (3) the statement must have been intentionally publicized by the government; (4) the stigmatizing statement must have been made in conjunction with an alteration of the employee's legal status, such as the termination of his employment; and (5) the government must have failed to comply with the employee's request for a name-clearing hearing." Id.; accord Kando v. R.I. State Bd. of Elections, 880 F.3d 53, 62 (1st Cir. 2018). The Court will apply this framework to the extent Plaintiff raises a claim alleging that he was afforded no due process to dispute the stigmatizing allegations and clear his name.[5]

Assuming the truth of Plaintiff's factual allegations and drawing all reasonable inferences in his favor, the claim fails because the Complaint does not aver any allegations establishing the first, third, and fifth elements of the cause of action. Most fatal to Plaintiff's claim is the fact that the alleged false accusations against him were never intentionally publicized or disseminated by any of the Defendants. Indeed, the Complaint only broadly alleges that Batista, Powers, and Dyer defamed Plaintiff by causing an official notice to be placed in his personnel file, attributing his termination to his refusal to obtain treatment for drug abuse. [Compl. ¶¶ 93-98]. "[T]he placement of damaging information in a personnel file, without further dissemination, is not sufficient to trigger the constitutional tort." Burton v. Town of Littleton, 426 F.3d 9, 17 (1st Cir. 2005) (citing Nethersole v. Bulger, 287 F.3d 15, 21 n.7 (1st Cir. 2002)). "[T]he due process requirement that [an employee] be afforded a hearing at which he may seek to clear his name is triggered only if the

---

[5] The Court believes that Defendants' analysis of the claim under Massachusetts law is misplaced. Indeed, the Complaint provides that Count II is a "Deprivation of Livelihood by Defamation, Fourteenth Amendment" brought under 42 U.S.C. § 1983 [Compl. at 9 (emphasis added)].

dismissal is based upon false and defamatory charges that are <u>disseminated</u> by the employer and stigmatize the employee so that the employe's freedom to obtain alternative employment is significantly impaired." <u>Ortega-Rosario v. Alvarado-Ortiz</u>, 917 F.2d 71, 74 (1st Cir. 1990) (emphasis added). Moreover, as a public employee, Plaintiff's personnel file "is not a record under state law and not subject to public disclosure." <u>Burton</u>, 426 F.3d at 17 (citing Mass. Gen. Laws. ch. 4, § 7; <u>Wakefield Tchr. Ass'n v. Sch. Comm.</u>, 731 N.E.2d 63, 67 (Mass. 2000)). Accordingly, Plaintiff's claim fails as a matter of law and must be dismissed as to all Defendants.[6]

### c) Count III: Deprivation of Livelihood by Failure to Intervene (42 U.S.C. § 1983)

At Count III, Plaintiff alleges that Dyer, Augustus, and Batista failed to intervene when he was taken off-duty, when he was suspended without pay, and then when he was terminated from his employment.[7] As we have noted before, supervisory liability under Section 1983 may neither be predicated upon the theory of respondeat superior nor solely on the supervisor's position of authority. <u>Guadalupe-Baez v. Pesquera</u>, 819 F.3d 509, 515 (1st Cir. 2016) (citing <u>Ramírez-Lluveras v. Rivera-Merced</u>, 759 F.3d 10, 19 (1st Cir. 2014)). Thus, a supervisory may only be liable "on the basis of his own acts or omissions." <u>Febus-Rodriguez v. Betancourt-Lebron</u>, 14 F.3d 87, 91-92 (1st Cir. 1994).

Under Section 1983, a supervisory may be liable if "a plaintiff can establish that his or her constitutional injury resulted from the direct acts or omissions of the official, or from indirect

---

[6] In addition, the Court has serious doubts that the allegations in the Complaint, as plead, raise any plausible inference that Powers, Dyer, and Batista were personally involved in the specific violation at issue. With regard to the City, the Complaint similarly fails to allege that a municipal custom, policy, or practice caused the alleged harm. <u>See generally supra</u>; <u>see</u> <u>Iqbal</u>, 556 U.S. at 676 (2009); <u>Monell</u>, 436 U.S. at 691. And, to the extent the claim is analogous to a defamation claim, it must be barred, as "it is well settled that a public employer cannot be sued for intentional tort claims." <u>Saltzman v. Town of Hanson</u>, 935 F. Supp. 2d 328, 347 (D. Mass. 2013); Mass. Gen. Laws ch. 258, § 10(c).

[7] To be precise, the Complaint alleges that Dyer, Augustus, and Batista failed to intervene, stop, or rescind Powers's actions, and that both Augustus and Batista failed to intervene, stop, or rescind Dyer's actions. [Compl. ¶¶ 101-04].

conduct that amounts to condonation or tacit authorization." Grajales v. P.R. Ports Auth., 682 F.3d 40, 47 (1st Cir. 2012). "Notice is a salient consideration in determining the existence of supervisory liability." Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998). A supervisor need not have actual knowledge of the wrongful conduct—rather, he "may be liable for the foreseeable consequences" of a subordinate's actions if the supervisor "would have known of it but for his deliberate indifference or willful blindness." Id. (quoting Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994)). "Mere negligence by a supervisor is not sufficient to create liability." Doe v. Sanderson, No. 16-12068-IT, 2018 WL 1586026, at *6 (D. Mass. Mar. 30, 2018) (citing Febus-Rodriguez, 14 F.3d 87 at 92). Deliberate indifference will only be found if plaintiff establishes "(1) a grave risk of harm, (2) the [defendants'] actual or constructive knowledge of that risk, and (3) the [defendants'] failure to take easily available measures to address that risk." Biscan v. Town of Wilmington, 721 F. Supp. 3d 127, 144 (D. Mass. 2024) (alteration in original) (quoting Rochleau v. Town of Millbury, 115 F. Supp. 2d 173, 181 (D. Mass. 2000)).

As an initial matter, supervisory liability under Section 1983 requires an underlying constitutional violation by a subordinate. Guadalupe-Baez, 819 F.3d at 515 (citing Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)). As discussed in our analysis of Counts I and II supra, Plaintiff has failed to plausibly allege that Powers's actions violated his constitutional rights. Because Plaintiff has not established an underlying constitutional violation, his supervisory liability claims against Dyer, Augustus, and Batista necessarily fail.

Even if Plaintiff had established that Powers's conduct amounted to a constitutional violation, the Complaint fails to allege sufficient facts to support a plausible inference that Dyer, Augustus, or Batista were directly involved in or had knowledge of the alleged unconstitutional conduct. The Complaint merely states that "Dyer deliberately and knowingly failed to intervene

to stop or to rescind Powers's actions," [Compl. ¶ 102], and makes similar conclusory allegations against Augustus and Batista, adding that they failed to intervene, stop, or rescind Dyer's actions [id. ¶¶ 103-04]. These are precisely the type of "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" that are insufficient under the pleading standard. Iqbal, 556 U.S. at 678. Critically, the Complaint fails to allege facts showing that Dyer, Augustus, or Batista had actual or constructive knowledge of any alleged constitutional violations. See Camilo-Robles, 151 F.3d at 7. While the Complaint alleges that Powers was the source of the allegedly false claim that Plaintiff had agreed to undergo treatment for drug abuse, [Compl. ¶ 78], it does not allege that Dyer, Augustus, or Batista had any type of knowledge of the alleged falsity. Similarly, the Complaint states that Powers knew of Plaintiff's child custody issues, [id. ¶¶ 50-51], but it does not allege that Dyer, Augustus, or Batista shared this knowledge or were aware of its significance to Plaintiff's situation. Without adequately establishing notice, it cannot follow that Defendants engaged in actions or omissions that amounted to condonation or tacit authorization. A supervisor cannot be deliberately indifferent to a risk he does not know exists.

The Complaint's defects do not end there. Plaintiff has also not alleged any facts establishing an "affirmative link" between any subordinate misconduct and the supervisory officials' actions or inactions. Although Plaintiff alleges in his opposition that "Dyer was contemporaneously aware of Powers' conduct at the meeting," [ECF No. 23 at 8], the Complaint itself does not contain factual allegations supporting the assertion. The Complaint merely states that "upon information and belief Powers ordered Rescue 1 to return to station without Burns" after the meeting, [Compl. ¶ 58], but fails to allege that Dyer was involved in or aware of what transpired at the meeting. As to Augustus and Batista, the Complaint alleges generally that, as city managers at different times, both had "responsibility to provide oversight and supervision of the

Fire Department command staff," [id. ¶¶ 12-13], but fails to allege any specific actions or knowledge on their part related to Plaintiff's situation. Allegations that Augustus and Batista "deliberately and knowingly failed to intervene," [id. ¶¶ 103-04], are conclusory statements that, without more, are insufficient to establish the necessary "affirmative link" for supervisory liability.

Therefore, Count III fails to state a claim upon which relief can be granted and must be dismissed.

### d) Counts IV and V: Unreasonable Search (42 U.S.C. § 1983; Massachusetts Declaration of Rights)

At Counts IV and V, Plaintiff alleges that Powers violated his right to privacy under the Fourth Amendment and Article 14 of the Massachusetts Declaration of Rights ("MDR") when Powers ordered that he submit to a drug test. The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. However, this protection is not without limits. The Fourth Amendment "does not proscribe all searches and seizures, but only those that are unreasonable." Skinner v. Ry. Lab. Execs.' Ass'n, 489 U.S. 602, 619 (1989). In certain contexts, such as highly regulated industries or safety-sensitive positions, the government's interest in public safety may outweigh individual privacy interests. See Murphy v. City of Newton, No. 15-12964, 2017 WL 6329614, at *4 (D. Mass. Dec. 11, 2017) (finding in the context of Fourth Amendment unreasonable search claim that "firefighters are generally considered to be a class of employees who may be drug tested due to safety concerns"). For instance, the government's interest in protecting public safety against the dangers of drug use by certain government employees "presents 'special needs' . . . that may justify departures from the usual warrant and probable-cause requirements" of the Fourth Amendment. Skinner, 489 U.S. at 620 (cleaned up). While testing of personnel of government employees in safety sensitive positions has been generally upheld against Fourth Amendment challenges, we are still required to engage in a

context-specific inquiry that balances the competing private and public interests. See Cabral v. Mass. Bay Trans. Auth., No. 18-12404-NMG, 2019 WL 3781567, at *12 (D. Mass. June 18, 2019) (quoting Chandler v. Miller, 520 U.S. 305, 314 (1997); Dwan v. Bay Transp. Auth., No. 95-12430-GAO, 1998 WL 151242, at *2 (D. Mass. Mar. 20, 1998)). To survive a Fourth Amendment challenge, a drug test "need not be authorized by or conducted pursuant to a federal regulation or an employer's stated policy[.]" Id. at *13 (citing Murphy, 2017 WL 6329614, at *6-7).

   In order to raise a viable claim pursuant to Article 14 of the MDR, Plaintiff must demonstrate that the drug test was an unreasonable search and seizure. Murphy, 2017 WL 6329614, at *7 (citing Jackson v. Liquid Carbonic Corp., 863 F.2d 111, 113, 115 (1st Cir. 1998)). Compared to the Fourth Amendment, the MDR can be more stringent. In fact, this Court is not aware that the Massachusetts Supreme Judicial Court has expressed any opinion on the "special needs" exception formulated in the context of the Fourth Amendment. Thus, in some cases, a search would be unreasonable under the MDR, yet constitutional under the Fourth Amendment. Compare Guiney v. Police Comm'r of Bos., 582 N.E.2d 523 (Mass. 1991) (holding that rule prescribing random testing of police officers imposes unreasonable search under MDR), with Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656 (1989) (holding that government agency was not required to obtain warrant prior to drug testing employees). Despite these differences, the Supreme Judicial Court has recognized that their holdings do "not . . . stand for the proposition that random drug testing can never survive state constitutional scrutiny." Bennett v. Mass. Bay Transp. Auth., No. 93-1409-E, 1998 WL 52250, at *11 (Mass. Jan. 28, 1998). Indeed, regardless of whether the drug testing upon a government employee is random or particularized, there must be a showing that facts exist warranting such testing. See Murphy, 2017 WL 6329614, at *7-8 (evaluating whether probable cause existed for plaintiff's particularized drug test); Bennett, 1998

WL 52250, at *12-13 (finding that random urinalysis of transportation officials was not unreasonable under state constitution because MBTA met burden showing that a substantial public need existed).

In the instant case, we need not delve too deep into the analysis because Plaintiff has not alleged that a search actually occurred. According to the Complaint, when ordered to submit to a drug test, Plaintiff "would not agree to take the test nor would not explicitly reject Powers' order to take it." [Compl. ¶ 52]. As no testing occurred, no search was conducted. See Weber v. Pierce Cnty. Wis. Dep't of Hum. Servs., No. 21-cv-300-wmc, 2022 WL 4103931, at *15 (W.D. Wis. Sept. 8, 2022) ("[Plaintiffs] refused to submit to drug testing . . . , so no 'search' ever occurred."); Coleman v. State of N.J. Div. of Youth & Fam. Servs., 246 F. Supp. 2d 384, 392 (D.N.J. 2003) ("Since [plaintiff] did not give consent . . . to conduct a drug test, and because no drug test was conducted, there was no search."). The mere demand to submit to a test, without more, does not constitute an unreasonable search under the Fourth Amendment or Article 14 of the MDR. Even if the demand itself could be considered a constitutional violation, Powers allegedly gave Plaintiff options: submit to the test, agree to rehabilitation, or face insubordination charges. The presentation of these options, even if unpalatable to the Plaintiff, cannot possibly support an inference that he was subjected to a search.

To the extent Plaintiff challenges that Powers lacked reasonable suspicion to order the test, the Court is unconvinced that the Complaint raises an actionable claim. While Plaintiff alleges that Powers's claim about his "pinpoint pupils" was false and made in bad faith, [Compl. ¶¶ 37, 44, 47], the First Circuit has recognized that "even a drug test that violates an employer's own policy or agreement with an employee or union is not necessarily unconstitutional." Cabral, 2019 WL 3781567, at *13. Plaintiff acknowledges in his Complaint that Powers observed him in person on

at least two occasions on September 21, 2022—first, at Green Hill Park, and later at the Fire Department's headquarters. [Compl. ¶¶ 30, 36]. While Plaintiff disputes Powers's ability to observe his pupils from 25 feet away and claims there were no physical signs of impairment, [id. ¶ 39], Powers's decision to order a drug test based on his observations does not rise to the level of a constitutional violation, particularly in light of the safety-sensitive nature of Plaintiff's position on the Rescue 1 crew, which responds to emergency situations and performs life-saving functions. See Skinner, 489 U.S. at 628 (noting that for safety-sensitive employees such as firefighters "even a momentary lapse of attention can have disastrous consequences"); [Compl. ¶¶ 20-22].[8]

In short, Plaintiff has not alleged that a search actually occurred, and even if the demand itself could constitute a violation, the Complaint does not plausible allege that Powers lacked reasonable suspicion to order the test given the safety-sensitive nature of Plaintiff's position. Accordingly, Counts IV and VI should be dismissed.

###### e) Count VI: Supervisory and Monell Claims (42 U.S.C. § 1983)

At Count VI, Plaintiff asserts a Section 1983 claim against the City, Batista, and Augustus based on supervisory and municipal liability. It is well established that a municipality cannot be liable under Section 1983 for the actions of its employees simply by virtue of the employment relationship. Monell, 436 U.S. at 691-92. Instead, in order to raise a viable claim of municipal liability, a plaintiff must identify a municipal policy or custom that caused the plaintiff's injury. Id. at 694; Tuttle, 471 U.S. at 818; Young, 404 F.3d at 25. "A Section 1983 claim based on a theory of municipal policy is only viable where 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted

---

[8] Moreover, while the parties have not presented evidence as to this question, the Court wonders if Plaintiff's employment agreement contained any clause requiring drug testing as a condition of employment. In fact, the Fire Department's employment website provides that "[t]o be appointed to the Fire Department, the following must be fulfilled: . . . [p]ass a drug test." Employment, CITY OF WORCESTER, https://www.worcesterma.gov/fire/about-us/employment (last accessed Mar. 20, 2025) (see "What are the requirements for appointment?").

and promulgated by that body's officers.'" <u>Freeman v. Town of Hudson</u>, 849 F. Supp. 2d 138, 149 (D. Mass. 2012) (quoting <u>Monell</u>, 436 U.S. at 690). A plaintiff may alternatively point to a municipality's custom or practice that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." <u>Monell</u>, 436 U.S. at 691. Regardless of whether plaintiff's theory is grounded upon municipal policy, practice, or custom, it "must be so tied to the challenged acts that it can be said to be the moving force of the constitutional violation." <u>Freeman</u>, 849 F. Supp. 2d at 149; <u>see also</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."). A single decision may result in municipal liability if the decision is made by an official with final policy-making authority with respect to the subject matter in question. See <u>Freeman</u>, 849 F. Supp. 2d at 149.

As a threshold matter, municipal liability under Section 1983 requires an underlying constitutional violation. <u>See</u> <u>Cox v. City of Boston</u>, No. 22-11009-RGS, 2024 WL 4608587, at *5 (D. Mass. Oct. 29, 2024); <u>Keller v. Town of Monson</u>, No. 3:20-cv-30187-KAR, 2024 WL 1251420, at *13 (D. Mass. Mar. 22, 2024). Because, as discussed <u>supra</u>, Plaintiff has failed to plausibly allege any constitutional violations, his <u>Monell</u> claim necessarily fails.

While the Court need not turn into alternatives, we feel compelled to note some of the other deficiencies in the Complaint. Plaintiff alleges that "[a]s chief executives and policymakers of the City, Augustus and Batista by their own conduct and/or according to policy and practice of the City did allow, approve, and implement Burns['] deprivation of livelihood without due process." [Compl. ¶ 120]. Plaintiff also alleges that "Dyer was informed of and did ratify and approve Powers' termination of Burns' work with Rescue 1, and Dyer did approve or himself ordered the

suspension of Burns without pay." [Id. ¶ 119]. These allegations are too conclusory and fail to identify any specific municipal policy or custom that was the moving force behind the alleged constitutional violations. Indeed, the Complaint does not identify any specific written policy, persistent practice, or decision officially adopted by the City that led to the alleged violations. While Plaintiff alleges that Powers and Dyer deprived him of his livelihood without due process, he does not provide factual allegations establishing a causal link between a City policy or custom and these alleged violations. Moreover, the Complaint lacks non-conclusory factual allegations that would allow the Court to infer that any officials implemented or executed a policy or custom that violated Plaintiff's constitutional rights. While we take note that a municipal policy may be derived from a single decision taken by an official with relevant decision-making authority, see Freeman, 849 F. Supp. 2d at 149, Plaintiff must still provide sufficient factual allegations to support such an inference, see Rinksy, 2010 WL 5437289, at *5-6 (holding that mere conclusory allegations of an official's role and obligations are insufficient). Therefore, Count VI fails to state a plausible claim and should be dismissed.

### f) Count VII: Conspiracy (42 U.S.C. § 1983; Massachusetts Common Law)

At Count VII, Plaintiff alleges that Powers and Dyer conspired to deprive him of his livelihood without due process and to do so by means of defamation, in violation of Section 1983 and Massachusetts common law. We will analyze both in turn.

Under Section 1983, a civil rights conspiracy involves "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Sanchez v. Foley, 972 F.3d 1, 11 (1st Cir. 2020) (quoting Est. of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008)). In

addition to a conspiratorial agreement, plaintiff must show "an actual abridgement of some federally-secured right." Id. (quoting Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001)). This requirement reflects the fact that a "[c]onspiracy is merely the mechanism by which to obtain the necessary state action, or to impose liability on one defendant[.]" Id. (quoting Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980)).

Plaintiff contends in Count VII that the abridged federal rights were "his well established constitutional right to be free of deprivation of his livelihood without due process and to be free of such deprivation by means of defamation." [Compl. ¶ 122]. As the Court has already established supra, the Complaint fails to establish a constitutional violation. Thus, Plaintiff's conspiracy claim under Section 1983 necessarily fails as a matter of law. See Price v. Mori, No. 1:18-cv-12035-IT, 2021 WL 352351, at *5 (D. Mass. Feb. 1, 2021) (granting summary judgment where plaintiff failed to show a violation of his constitutional rights). And, in any event, Plaintiff does not point to any facts indicating an actual agreement between Dyer and Powers. In fact, the Complaint is almost devoid of any allegations regarding Dyer. The Complaint only alleges that Dyer was acting chief of the Fire Department with knowledge of and a duty to observe firefighters' rights. [Compl. ¶¶ 6, 14]. That allegation, considered together with the conclusory statement that "Dyer and Powers conspired to use their authority acting under color of law," [id. ¶ 122], cannot raise an appropriate reasonable inference that Dyer and Powers made any type of agreement.

Massachusetts law recognizes two types of civil conspiracy: the first is true conspiracy, "based on coconspirators exerting some peculiar power of coercion," and the second is concerted action conspiracy, a "form of vicarious liability for the tortious conduct of others . . . require[ing] an underlying tort." Greene v. Philip Morris USA Inc., 208 N.E.3d 676, 682 (Mass. 2023) (cleaned up); Taylor v. Am. Chemistry Council, 576 F.3d 16, 34-35 (1st Cir. 2009).

The second theory, concerted action conspiracy, "applies to a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." Greene, 208 N.E.3d at 683 (quoting Kurker v. Hill, 689 N.E.2d 833, 837 (Mass. App. Ct. 1998)). As such, proof of an underlying tort is required. Taylor, 576 F.3d at 35. Plaintiff fails to successfully plead his IIED claim, see infra. Therefore, Plaintiff cannot assert civil conspiracy under the concerted action theory.

This leaves only the true conspiracy theory under Massachusetts law. To advance a true conspiracy claim, Plaintiff must allege and prove "that by 'mere force of numbers acting in unison' the defendants exercised 'some peculiar power of coercion of the plaintiff which any individual standing in a like relation to the plaintiff would not have had.'" Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d 236, 244 (D. Mass. 1999) (quoting Fleming v. Dane, 22 N.E.2d 609, 611 (Mass. 1939)). In other words, Dyer and Powers must collectively be able to "bring about results that are different in kind from what any of them could achieve individually." Koufos v. U.S. Bank, N.A., 939 F. Supp. 2d 40, 51 (D. Mass. 2013) (quoting Shirokov v. Dunlap, Grubb & Weaver, PLLC, No. 10-12043-GAO, 2012 WL 1065578, at *25-26 (D. Mass. Mar. 27, 2012)). In the present case, Plaintiff does not plead any facts that demonstrate that Dyer and Powers exercised a "peculiar power of coercion" beyond conclusorily stating that they "conspired to accomplish the unlawful end of depriving Burns of his livelihood by means of an indefinite unpaid suspension imposed without notice or due process." Mass. Laborers' Health & Welfare Fund, 62 F. Supp. 2d at 244; [ECF No. 1 ¶¶ 122-25.] Plaintiff does not point to any facts indicating an actual agreement between Dyer and Power; he merely conclusory alleges that they conspired to deprive him of his constitutional rights. Moreover, Plaintiff does not allege any facts that indicate that the

Dyer and Powers could not have achieved the same result individually. Therefore, the Court finds that Plaintiff cannot advance on a "true conspiracy" claim.

Accordingly, the Court will grant Defendants' motion to dismiss as to Count VI of the Complaint.

### g) Qualified Immunity

Defendants posit that all counts asserting damages against Powers, Dyer, Batista, and Augustus cannot advance because they are entitled to qualified immunity against Plaintiff's claims under Section 1983. [ECF No. 19 at 28-30.] Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mullenix v. Luna, 577 U.S. 7, 11 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). The Court does a two-step analysis to determine if qualified immunity bars a claim. The Court "must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (citing Pearson, 555 U.S. at 232). For the second step, a right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (citation omitted). A case directly on point is not required, but "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).

When defendants invoke a qualified immunity defense, "the burden is on the plaintiff to show that the defense is inapplicable." Escalera-Salgado v. United States, 911 F.3d 38, 41 (1st Cir. 2018). Thus, Plaintiff has the burden of identifying "controlling authority or a robust consensus of persuasive authority such that any reasonable official in the defendant's position would have

known that the challenged conduct is illegal in the particular circumstances that he or she faced." Rivera-Corraliza v. Morales, 794 F.3d 208, 214-15 (1st Cir. 2015) (citations omitted); Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 23 (1st Cir. 2016) (highlighting that Plaintiff is required to "spotlight controlling authority or a robust consensus of cases of persuasive authority" (citations and quotations omitted)); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir. 1997) (finding that when a defendant invokes qualified immunity, "it is the plaintiff's burden to demonstrate the infringement of a federally assured right. If she fails to do so, the [defendant] prevails" (citation omitted)). The Court is free to address the steps in any particular order. See Raiche v. Pietroski, 623 F.3d 30, 35 (1st Cir. 2010) ("These two prongs of the analysis need not be considered in any particular order, and both prongs must be satisfied for a plaintiff to overcome a qualified immunity defense.").

Because the facts as alleged in the Complaint fail to show a violation of a constitutional right as to any Counts, the Court need not engage in a qualified immunity analysis as to those Counts. See Maldonado, 568 F.3d at 269 (explaining that a qualified immunity requires finding whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right). Nonetheless, even if Plaintiff had succeeded in alleging an actionable claim, Plaintiff fails to satisfy his burden in establishing that "controlling authority or a robust consensus of persuasive authority" exists establishing that the constitutional question is beyond debate. Rivera-Corraliza, 794 F.3d at 214. In fact, he does not engage with Defendants' qualified immunity argument at all. [See generally ECF No. 23]. Since the burden to "demonstrate the infringement of a federally assured right" is on the Plaintiff, failure to do so would entitle the Defendants to qualified immunity. Quintero de Quintero, 974 F.2d at 228.

### B.  State Law Claims

#### 1.  Count VIII: Massachusetts Civil Rights Act (Mass. Gen. Laws ch. 12, § I)

At Count VII, Plaintiff alleges that Powers tried to force him by means of threats, intimidation, and coercion to waive his federal and state rights to be free from unreasonable searches and invasions of privacy. The Massachusetts Civil Rights Act ("MCRA") creates a private action in which individuals may recover for constitutional violations regardless of whether they acted under the color of law. Mass. Gen. Laws ch. 12, § 11I; see Sena v. Commonwealth, 629 N.E.2d 986, 993 (Mass. 1994). To state a viable MCRA claim, a plaintiff must demonstrate that "(1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." Barron v. Kolenda, 203 N.E.3d 1125, 1139-40 (Mass. 2023) (quoting Glovsky v. Roche Bros. Supermkts., Inc., 17 N.E.3d 1026, 1035 (Mass. 2014)).

Under the MCRA,

> a threat consists of the intentional exertion of pressure to make another fearful or apprehensive of injury or harm; intimidation involves putting in fear for the purpose of compelling or deterring conduct; and coercion is the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.

Glovsky, 17 N.E.3d at 1035 (cleaned up) (quoting Haufler v. Zotos, 845 N.E.2d 322, 335 (Mass. 2006)). Whether a defendant's conduct "constitutes such threats, intimidation, or coercion" depends on whether a reasonable person would feel threatened, intimidated, or coerced. Id. (citation omitted).

"Both threats and intimidation often rely on an element of actual or threatened physical force, an element that is missing in this case." Kennie v. Nat. Res. Dep't of Dennis, 889 N.E.2d 936, 944 (Mass. 2008) (citation omitted). However, Massachusetts courts have found that

"coercion is a broader category that may rely on physical, moral, or economic coercion." <u>Id.</u> (finding a genuine issue of fact as to whether town official's words and authority used to prevent homeowners from obtaining a permit amounted to non-physical coercion). While it is rare for non-physical conduct to be actionable under the MCRA, "purely economic pressures may constitute actionable coercion under the MCRA[.]" <u>Thomas v. Harrington</u>, 909 F.3d 483, 492 (1st Cir. 2018) (citation omitted).

Case law as to what constitutes non-physical coercion is unsettled. However, courts have typically found that a finding of non-physical coercion "require[s] 'a pattern of harassment and intimidation[.]'" <u>Id.</u> at 493 (citing <u>Howcroft v. City of Peabody</u>, 747 N.E.2d 729, 746 (Mass. App. Ct. 2001). The ability to show non-physical coercion under the MCRA is foreclosed when a mere "threat to use lawful means to reach an intended result" is made. <u>Id.</u> (quoting <u>Buster v. George W. Moore, Inc.</u>, 783 N.E.2d 399, 411 (Mass. 2003)); <u>see</u> <u>McClain v. Cape Air</u>, No. 22-cv-10649-DJC, 2023 WL 3587284, at *9 (D. Mass. May 22, 2023) ("Without more, a threat to use lawful means to reach an intended result is not actionable." (citation omitted)).

Plaintiff alleges that Powers attempted to interfere with his Fourth Amendment and MDR rights by ordering him to submit to a drug test without legitimate reasonable suspicion, claiming Powers "repeatedly told Burns 'you're on drugs,' and that 'your pupils are pin-point;' he ordered Burns to submit to drug testing of his urine and accused Burns of insubordination when he did not agree." [Compl. ¶ 37]. According to the Complaint, Powers presented Plaintiff with three options: submit to the test, refuse and face insubordination charges, or refuse testing but admit to drug abuse and enter rehabilitation. [<u>Id.</u> ¶¶ 37, 68]. These allegations fail to raise a plausible claim. Specifically, the Court is unconvinced that any interference or attempt to interfere was made by means of threats, intimidation or coercion. As an initial matter, because the Complaint does not

allege any "actual or threatened physical force," it cannot thus raise the use of any threats or intimidation. <u>Kennie</u>, 889 N.E.2d at 944. Analyzed under the lens of coercion, Powers's warning that Plaintiff would face disciplinary action for insubordination if he refused the drug test constitutes a threat to use lawful means. <u>See</u> <u>Thomas</u>, 909 F.3d at 493 (quoting <u>Buster</u>, 783 N.E.2d at 411); <u>McClain</u>, 2023 WL 3587284, at *9. As deputy fire chief, Powers arguably had the authority to order reasonable suspicion drug testing and to initiate disciplinary proceedings for insubordination. [<u>See</u> Compl. ¶¶ 7, 14]. Plaintiff does not dispute this fact. Moreover, whether reasonable suspicion existed relates to the underlying unreasonable search claims (Counts IV and V) rather than to whether the means threatened were lawful. Finally, Plaintiff has not alleged facts that would establish the "pattern of harassment and intimidation" that courts have typically required to find non-physical coercion actionable under the MCRA. <u>Thomas</u>, 909 F.3d at 493. The Complaint describes a single meeting where Powers presented Plaintiff with three options. [Compl. ¶ 37]. While Plaintiff alleges that Powers knew about his child custody dispute, [<u>id.</u> ¶¶ 50-51], this alone does not transform an otherwise lawful disciplinary threat into actionable coercion under the MCRA.

Accordingly, Count VIII fails to state a claim upon which relief can be granted.

### 2.  Count IX: Invasion of Privacy (Mass. Gen. Laws ch. 214, § 1B)

At Count IX, Plaintiff alleges that Powers invaded his privacy when he demanded that Plaintiff submit to a drug test after fabricating that Plaintiff was on drugs. Under Massachusetts law, "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." Mass. Gen. Laws ch. 214, § 1B. To raise a viable claim of invasion of privacy, a plaintiff must demonstrate "that there was 1) a gathering and dissemination of facts of a private nature that 2) resulted in an unreasonable, substantial or serious interference with his privacy." <u>Branyan v. Sw. Airlines Co.</u>, 105 F. Supp. 3d 120, 126 (D. Mass. 2015) (citing <u>Nelson v. Salem</u>

State Coll., 845 N.E.2d 338, 348 2006)). The disclosure must be of a "highly personal or intimate nature," such as "marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcohol consumption, family fights, and reputation." Greenspan v. MasMarques, No. 23-cv-10134-DJC, 2024 WL 1258062, at *16 (D. Mass. Mar. 25, 2024) (quoting Taylor v. Swartwout, 445 F. Supp. 3d 98, 103 (D. Mass. 2006); Georgiou v. Comm'r of the Dep't of Indus. Accidents, 854 N.E.2d 130, 134-35 (Mass. App. Ct. 2006)). Nevertheless, "legitimate countervailing business interests in certain situations may render the disclosure of personal information reasonable and not actionable under the statute." Bratt v. Int'l Bus. Machs. Corp., 467 N.E.2d 126, 135 (Mass. 1984). In the employment context, "courts will balance the legitimacy of an employer's need to obtain personal information against the seriousness of the intrusion into the employee's privacy." Branyan, 105 F. Supp. 3d at 126 (citing French v. United Parcel Serv., Inc., 2 F. Supp. 2d 128, 131 (D. Mass. 1998)). This is particularly relevant in cases involving drug testing in safety-sensitive positions. See O'Connor v. Police Comm'r of Bos., 557 N.E.2d 1146, 1150 (Mass. 1990) (in balancing interests, finding that "defendants had a compelling interest in determining whether cadets were using drugs and in deterring such use. Those interests outweigh the plaintiff's privacy interest" under MDR and Mass. Gen. Laws ch. 214, § 1B).

Here, Plaintiff's invasion of privacy claims must be dismissed for two primary reasons. First, the Complaint does not allege that any actual gathering or dissemination of private information occurred. Indeed, as we held in connection to the unreasonable search claims, see supra, Plaintiff did not submit to any drug test. [See Compl. ¶ 52 ("Burns would not agree to take the test nor would not explicitly reject Powers's order to take it.")]. Since no test was administered, no gathering of private information occurred. Without the gathering element, Plaintiff cannot establish the first prong of an invasion of privacy claim under Massachusetts law.

Second, even assuming the attempted drug test constitutes an interference with privacy, the Complaint's own allegations establish that this interference was not unreasonable, substantial, or serious when balanced against the City's legitimate interests. Massachusetts courts have consistently recognized that employers have heightened interests in maintaining a drug-free workplace in safety-sensitive positions. See supra; Webster v. Motorola, Inc., 637 N.E.2d 203, 207-08 (Mass. 1994) (finding that employer's interest in drug testing of plaintiff employee to prevent harm to human health and national security outweighed his individual privacy interests). As alleged in the Complaint, Plaintiff was a firefighter and a member of a specialized rescue unit. [Compl. ¶¶ 15, 19-23]. The Complaint specifically describes how Rescue 1 "specializes in recovery of people or bodies from fire scenes or other incident locations where people may have been injured or killed," and that "crew members are first responder certified in emergency first aid and cardio-pulmonary resuscitation." [Id. ¶ 20]. This position clearly qualifies as safety-sensitive where the City has a substantial interest in ensuring that employees are not impaired while on duty.

Moreover, while Plaintiff contends that Powers fabricated the observation about his pupils, the Complaint nonetheless acknowledges that Powers believed he had reasonable suspicion to order the test based on his observation that Plaintiff's pupils were "pin-point." [See id. ¶ 37]. And, notwithstanding Plaintiff's allegations that he never abused or consumed drugs or alcohol while on duty,[9] or even reasonably appeared as being under the influence, "Burns repeatedly asked for 'mental health help'" after Powers asked that he submit to a drug test, confirming any suspicion Powers may have had. [Id. ¶¶ 40-44, 55]. These allegations create a legitimate countervailing interest that renders the requested drug test reasonable under the privacy statute. See O'Connor, 557 N.E.2d at 1150.

---

[9] Notably, the Plaintiff admits that he "had recently begun the lawful off-duty use of prescribed oral Cannabidiol . . . as a sleep aid." [Compl. ¶ 46].

Accordingly, Count IX fails to state a claim upon which relief can be granted and should be dismissed.

### 3.  Count X: Intentional Infliction of Emotional Distress

At Count X, Plaintiff contends that Powers intentionally inflicted emotional distress when he fabricated the allegation that Plaintiff was on drugs while on duty, knowing about the potential impacts it would have on his custody case and livelihood. In order to establish a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must show "(1) that [Defendants] intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014) (citing Howell v. Enter. Publ. Co., 920 N.E.2d 1, 28 (Mass. 2010)). A plaintiff must also allege more than bare assertions to demonstrate that the emotional distress was severe. Polay, 10 N.E.3d at 1130 (holding that statements that do "not constitute an allegation of fact but rather a recitation of the element of severe emotional distress" do not suffice).

The conduct for an IIED claim must "go beyond all possible bounds of decency, and [be] regarded as atrocious, and utterly intolerable in a civilized community." Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 240 (1st Cir. 2013) (quoting Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1987)). Dismissal is appropriate if the "conduct alleged in the complaint does not rise to this level." Polay, 10 N.E.3d at 1128-29 (citing Beecy v. Pucciarelli, 441 N.E.2d 1035, 1040 (Mass. 1982)). The trier of fact may "put as harsh a face on the actions of the [defendants] as the basic facts would reasonably allow[,]" but the standard is still very high. Richey v. Am. Auto. Ass'n, Inc., 406 N.E.2d 675, 678 (Mass. 1980) (finding that at worst, a supervisor's decision to terminate plaintiff was "bad, unjust, and unkind[,]" but did not amount to IIED even if plaintiff was particularly on edge); Polay, 10 N.E.3d at 1128.

Here, Plaintiff alleges that Powers acted with knowledge of Burns's child custody dispute and fabricated a false allegation that Plaintiff was on drugs and under the influence while on duty. Plaintiff claims Powers knew that such an accusation would cause him "overwhelming consternation and distress" due to the potential impacts on his family life and livelihood. [Compl. ¶¶ 134-37]. Accepting these allegations as true and drawing all reasonable inferences in Plaintiff's favor, the conduct described does not rise to the level of "extreme and outrageous" behavior required to sustain an IIED claim. While Powers's alleged actions in fabricating a reason to demand drug testing may have been improper if true, they do not "go beyond all possible bounds of decency" or qualify as "atrocious, and utterly intolerable in a civilized community" as required under Massachusetts law. See Young, 717 F.3d at 240; Galvin v. U.S. Bank, N.A., 852 F.3d 146, 161 (1st Cir. 2017) (holding that the standard is "very high and is not met even if the defendant acted with an intent which is tortious or even criminal, with malice, or with a degree of aggravation which would entitle the plaintiff to punitive damages for another tort" (cleaned up)); Sneade v. Rojas, No. 11-40061-TSH, 2014 WL 949635, at *8 (D. Mass. Mar. 10, 2014) (defendant officer's conduct of shooting plaintiffs' dog that ran out of kitchen and barked at officer but then remained sitting lacked "requisite level of outrageousness and atrocity").

Additionally, Plaintiff has not sufficiently alleged that he suffered severe emotional distress as a result of Powers's actions. The Complaint alleges that Plaintiff experienced "severe hardship and emotional distress," [Compl. ¶ 137], but this conclusory recitation of an element of the claim, without specific factual allegations about the nature and severity of the distress, is insufficient. Polay, 10 N.E.3d at 1130. While the Complaint indicates that Plaintiff became distraught during the meeting with Powers, with "tears streaming down his face," [Compl. ¶ 54], it does not allege facts showing that Plaintiff suffered emotional distress "that no reasonable person could be

expected to endure," <u>Limone v. United States</u>, 579 F.3d 79, 94 (1st Cir. 2009). Therefore, Count X fails to state a claim upon which relief can be granted and must be dismissed.

**IV.    Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss [ECF No. 18] is **<u>GRANTED</u>**.

**SO ORDERED.**

Dated: March 20, 2025

                                         _/s/ Margaret R. Guzman_
                                         Margaret R. Guzman
                                         United States District Judge